```
                   UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT


CLARA BRACONE,                       :

     Plaintiff,                      :

V.                                   :    Case No. 3:05-CV-1312(RNC)

BRIDGEPORT & PORT JEFFERSON          :
STEAMBOAT COMPANY,

     Defendant.                      :
```

RULING AND ORDER

On February 6, 2005, the plaintiff, Clara Bracone, then 77 years of age, was a passenger on the defendant's ferry, the Park City, on a noon voyage from Port Jefferson, New York to Bridgeport, Connecticut. Shortly before the ferry docked in Bridgeport, the plaintiff fell while attempting to step down from the edge of a ramp onto an adjacent deck. As a result of the fall, she sustained a concussion and other injuries. An accident report prepared at the time (see PX 2) stated that "she apparently did not see [the] step [down] or may have just lost her balance." Another report (see PX 3) stated that she "missed at [the] step down and fell." After the plaintiff's accident, two orange stanchions connected at their tops by a yellow chain were placed on the edge of the ramp to prevent similar accidents (see PX 8A, photos 12-14).

Plaintiff brings this negligence action pursuant to the Court's maritime jurisdiction seeking compensation for her injuries. She alleges that the unguarded edge of the ramp

constituted a hazardous condition and that the defendant negligently failed to make the ramp reasonably safe.  The defendant responds that the edge of the ramp did not constitute an unreasonable hazard, that the height differential between the edge of the ramp and the adjacent deck was open and obvious and marked by yellow paint, and that the plaintiff's fall was caused by her own negligence.  A bench trial has been held.  For reasons set forth below, I find in favor of the plaintiff but reduce her damages by seventy per cent and award her a total of $100,691.

Applicable Law

Under the general maritime law of the United States, a shipowner is not an insurer of its passengers' safety.  See Moore v. American Scantic Line, Inc., 121 F.2d 767, 768 (2d Cir. 1941).  But a shipowner does owe passengers a duty to exercise reasonable care under the circumstances.  See Monteleone v. Bahama Cruise Line, Inc., 838 F.2d 63, 64-65 (2d Cir. 1988); Rainey v. Paquet Cruises, Inc., 709 F.2d 169, 172 (1983).  Liability may be imposed on the defendant if it breached this duty and the breach was a proximate cause of the plaintiff's injuries.  See Monteleone, 838 F.2d at 65; Wish v. MSC Crociere S.A., No. 07-60980-CIV, 2008 WL 5137149,*2 (S.D.Cal.  Nov. 24, 2008)(mere fact that passenger slips and falls does not make the shipowner liable; plaintiff must prove that shipowner breached its duty of reasonable care).

Under general principles of negligence law, which usually apply in maritime cases, see Rainey, 709 F.2d at 172, a shipowner must exercise reasonable care to maintain its premises in a safe condition considering (1) the possibility of injury to passengers, (2) the seriousness of potential injuries and (3) the burden of avoiding the risk of harm.  See United States v. Carroll Towing Co., Inc., 159 F.2d 169, 173 (2d Cir. 1947)(discussing three variables to consider in determining whether defendant was negligent).  In accordance with these principles, a shipowner may be liable for harm caused by a condition whose danger was obvious if the shipowner was negligent in not correcting it.  See Napoli v. Hellenic Lines, Ltd., 536 F.2d 505, 508-09 (2d Cir. 1976)(holding that when a shipowner knows of an obviously dangerous condition his duty to take corrective action is as set forth in section 343A of the Restatement (Second) of Torts).  Accord Gargano v. Azpiri, 110 Conn. App. 502, 510 (2008)(property owner may be liable for harm caused by dangerous condition that was open, obvious and actually known to invitee if property owner negligently breached its duty to make the premises reasonably safe).[1]

---

[1]   State law concerning premises liability is appropriately applied in this case as long as it does not conflict with maritime law.  See Just v. Chambers, 312 U.S. 383, 388 (1941)("With respect to maritime torts we have held that the State may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when the state action is not hostile to the characteristic

Under maritime law, the doctrine of pure comparative negligence applies.  See Pope & Talbot, Inc. v. Hawn, 346 U.S. 406 (1953).  Thus, a passenger's contributory negligence does not bar him from recovering damages against a negligent shipowner but it does reduce his damages in proportion to his fault.  See Nygren v. American Boat Cartage, Inc., 290 F.2d 547, 548 (2d Cir. 1961)(per curiam)(because passenger and water taxi were equally at fault in causing plaintiff's fall, passenger's recovery was reduced by fifty per cent).

Findings of Fact

The Park City was built in 1985.  It is 260 feet long and has three decks.  It has a capacity of 998 passengers and 80 vehicles.  On the day of the plaintiff's accident, the ferry was carrying 89 passengers, 41 vehicles and a crew of five.  The Coast Guard had inspected the ferry numerous times without requiring any modifications of the ramp where the plaintiff fell.  There is no evidence that the defendant received complaints about the unguarded edge of the ramp before the plaintiff's accident, nor any evidence that anyone had fallen there before.  However, the defendant itself recognized that the unguarded edge of the ramp created a risk of a fall.  To reduce this risk, it applied yellow paint to the edge of the ramp, thereby alerting

---

features of the maritime law or inconsistent with federal legislation.").

pedestrians that there was a difference in elevation between the ramp and the adjacent car deck.

On the day of the accident, the plaintiff was accompanied by her adult son, Albert, and his fiancée, Kathleen Weiner.  The plaintiff and her son were very familiar with the ferry, and its layout, having taken the ferry numerous times before.  When they boarded at Port Jefferson on the day of the accident, they parked on the port aft ramp, which connects the main deck and the mezzanine deck on the port side of the ferry.  From there they walked to the passenger lounge, located on the top deck, via the starboard aft ramp, which connects the main and mezzanine decks on the starboard side of the ferry.  When they walked up the starboard aft ramp, they passed the place where the plaintiff would later fall.

As the ferry was preparing to dock in Bridgeport, an announcement was made over the public address system informing passengers to go to their vehicles.  On hearing this announcement, the plaintiff and her two companions left the passenger lounge to return to the main deck.  The plaintiff did not request assistance from the ferry crew, although she knew assistance was available.  Mr. Bracone walked ahead of the plaintiff and Ms. Weiner.  He wanted to get to their vehicle first in order to prepare to help load the plaintiff into the vehicle.

The three descended a stairway (see DX 5, page 3; PX 8A, photo 28) leading to the top of the starboard aft ramp (see DX 5, page 5).  This ramp has a main body, which is about 35 feet long, and a tail section, which is 8 feet long (see PX 8A, photos 23 and 24,  showing the main body and tail section of the port side aft ramp).  It is a "mixed traffic" ramp: the starboard side has a walkway with a handrail affixed to the ferry hull to assist passengers in descending the ramp until it becomes flush with the main deck (see DX 5, pages 4-6; PX 8A photo 28, 47); the port side is designed to be used for stowing vehicles (see PX 8A, photos 18, 19, 39).  At the ramp's highest level, its port side edge is guarded by a barrier about 35" high formed by a two-course solid guardrail (see DX 5, page 5).  This barrier extends along the edge of the ramp to a point approximately ten feet above the start of the ramp's tail section.  From there, the edge of the ramp is guarded by a loose yellow chain running from the end of the barrier across the tops of two yellow poles spaced about five feet apart (see PX 8A, photo 18).  The second (or lower) of these two yellow poles is located at the junction of the main body of the ramp and the tail section (see PX 8A, photo 20).  On the day of the accident, nothing guarded the port side edge of the ramp beyond this second yellow pole.  As mentioned earlier, this edge is now guarded by two orange stanchions connected at their tops by a yellow chain.  These stanchions and

chain now serve to guard the edge of the ramp until the ramp is flush with the main deck (see PX 8A, photos 12, 13, 24).

When Mr. Bracone reached the bottom of the stairway leading to the top of the starboard aft ramp, he could have walked straight ahead and used the passenger walkway and handrail to descend to the main deck (see PX 8A, photo 28, 30).  Because the number of vehicles on board that day was about half the ferry's capacity, it is reasonable to infer that the passenger walkaway provided an unobstructed path to the main deck.  Instead of taking this route, Mr. Bracone crossed to the port side of the ramp.  Vehicles were parked on this side of the ramp but a narrow space was available for walking between the vehicles and the barrier.[2]  Mr. Bracone took this route because it was shorter and he thought it was safe.

The plaintiff and Ms. Weiner followed Mr. Bracone to the port side of the ramp and entered the narrow space between the vehicles and the barrier.  The plaintiff had her glasses on and was wearing winter boots with low heels.  She has testified that before descending the ramp through this narrow space she gave any items she was carrying to her son and Ms. Weiner.  According to Ms. Weiner's testimony, however, the plaintiff was still carrying

---

[2]  The upper photo in PX 12 provides a view of this narrow space (the vehicles in this photo are parked facing the bow; on the day of the accident, the vehicles were parked facing the stern.)

her handbag when she fell.  I credit Ms. Weiner's testimony on this point.

The three proceeded to descend the ramp single file with Mr. Bracone in the lead.  When he reached the start of the tail section, he stepped off the edge of the ramp at a point a foot or two beyond the second yellow pole, where the step-down to the adjacent car deck is about 8 inches (see PX 8A, photos 13 - 24).  He then headed toward his vehicle.  The plaintiff continued past the second yellow pole another couple of steps.  If she had taken yet another step or two, she would have been on the flat surface of the main deck.  But she did not do this.  Instead, she turned to her right and attempted to move from the edge of the ramp onto the car deck below.  This involved stepping down about two inches from a surface that slopes toward the stern onto a surface that slopes toward the bow (see PX 8A, photos 13, 14, 17, 18, 23, 24).

The plaintiff placed her left foot on the car deck then fell forward.  She did not reach out to break her fall and Ms. Weiner was unable to grab her from behind, although she tried.  The plaintiff fell face first into the bumper of a vehicle.  The upper left side of her face struck the bumper and she was knocked unconscious.  She sustained lacerations and contusions to her face and scalp, cervical strain, lumbar strain, contusions and abrasions to both knees and a fractured tooth.  Her upper extremities were not hurt, but the fall aggravated a pre-existing

condition in her right shoulder associated with a rotator cuff tear. When she regained consciousness she kept saying to her son, "What did I do to myself?"

The evidence does not permit a reliable finding concerning the event that initiated the plaintiff's fall. The plaintiff herself has testified that as she stepped off the ramp the heel of her rear foot got caught in a hole. Her own counsel treats this as conjecture. Ms. Weiner, the only person who actually saw the plaintiff fall, has testified that she thinks the plaintiff tripped on a piece of metal that protruded above the surface of the edge of the ramp. Ms. Weiner's theory is unsupported by other evidence and forms no part of the plaintiff's case. Mr. Bracone suspects that the plaintiff fell because she did not see the two-inch drop from the edge of the ramp to the adjacent deck. Similarly, the plaintiff's liability expert has taken the position that the plaintiff fell because she "did not expect there to be any discontinuity in the surface on which she was walking" (see PX8, page 4, ¶ 11). On the evidence in the record, however, it is just as likely that she looked and misjudged the difference in elevation. The defendant's expert has proposed yet another theory. Giving some credence to the plaintiff's account, he suggests that she stumbled forward because she failed to properly lift her rear foot off the high-traction surface of the ramp. My own speculation is that she got into trouble because

she stepped left foot first without appreciating that the deck sloped toward the bow.

Though the evidence does not permit a finding by a preponderance regarding the event that initiated the plaintiff's fall, this does not prevent her from obtaining a judgment.  The defendant knew that passengers used the port side of the starboard aft ramp to return to their vehicles on the main deck.  It did not discourage them from doing so on the day of the accident or, apparently, any other time.  It is undisputed that the unguarded edge of the tail section of the ramp presented a hazard, one the defendant tried to mitigate by painting the edge with contrasting yellow paint.  The defendant contends that the yellow paint made the hazard reasonably safe.  The defendant's argument has considerable force, as evidenced by the fact that this was the first time anyone reported falling.  See Brinson Ford, Inc. v. Alger, 228 S.W.3d 161, 163 (Tex. 2007) (holding as a matter of law that ramp outlined in yellow to indicate change in elevation did not pose an unreasonable risk of harm).  But the defendant could reasonably anticipate that passengers nearing the bottom of the ramp would have their attention distracted by nearby pedestrian traffic and would fail to realize that there was still a difference in elevation between the edge of the ramp and the adjacent car deck.  See Warner v. Hansen, 251 Iowa 685, 693-94, 102 N.W.2d 140, 145-46 (Iowa

1960)(shopper who fell in defendant's store after failing to see step-off from landing at bottom of stairway entitled to have jury decide closely-related issues of negligence and contributory negligence; step-off was not visible until bottom of stairway was reached, shopper could think there would be no additional step beyond the end of the handrails, and store could reasonably anticipate that shopper's attention would be distracted by goods on display); see also Nider v. Republic Parking, Inc., 169 P.3d 738, 745-46 (Okla. Civ. App. 2007)(pedestrian who fell on ramp of garage entitled to jury trial on negligence claim against operator of garage despite open and obvious nature of alleged hazard; any number of factors, such as the proximity of the sidewalk and the garage's street entrance to the location of the fall, invited distraction from the hazard).

   In addition, the probability that a passenger would fall off the unguarded edge of the ramp is only one of the variables that must be considered in determining whether the defendant breached its duty to use reasonable care.  The others - the gravity of the potential harm if someone did fall and the burden on the defendant of taking adequate precautions - weigh in favor of finding that merely painting the edge with yellow paint was insufficient to satisfy the defendant's obligation to make the ramp reasonably safe.  Even though the probability of a fall was remote, the serious nature of the injuries that could reasonably

be anticipated if an elderly passenger were to fall at this location outweighed the insignificant burden of guarding the edge with stanchions connected by a chain, the additional precaution the defendant took after the plaintiff's accident.[3]  If these stanchions and chain had been in place on the day of the plaintiff's accident, they necessarily would have prevented the accident because the plaintiff would not have tried to step off the edge of the ramp.  Accordingly, I find that the defendant was negligent and that its negligence was a substantial factor in causing the plaintiff's injuries.[4]

With regard to the issue of contributory negligence, the defendant has proven that the plaintiff failed to use due care in two critical respects: first, when she followed her son down the port side of the ramp instead of using the passenger walkway and handrail on the starboard side; and second, when she stepped off the edge of the ramp onto the sloping surface of the adjacent car deck instead of stepping forward onto the flat surface of the main deck.  Though the plaintiff and her supporting witnesses

---

[3]  The defendant contends that the stanchions make it somewhat more difficult for drivers to maneuver their vehicles but the evidence does not support a finding that this is a significant problem.

[4]  The plaintiff's expert has testified that the defendant was obliged to install a handrail that extended to the bottom of the ramp.  Because the stanchions that are now in use would have sufficed to prevent the plaintiff's fall, I make no finding on the disputed question whether a handrail was needed to make the ramp reasonably safe.

have testified that she was active for her age, the record establishes that she was diabetic, with degenerative arthritis in her back, neck and knees, a pronounced scoliosis of the lumbar spine and poor eyesight.  There is evidence in the record that she hurt her back in a previous fall at home.  Mr. Bracone felt that she needed his assistance getting into their vehicle.  Considering all the evidence, I find that due care for her own safety required the plaintiff to use the passenger walkway and handrail on the starboard side of the ramp.  I also find that when she reached the bottom of the ramp, due care required her to step forward onto the flat surface of the main deck.  She should not have tried to step down from the ramp to the adjacent car deck, which sloped in the opposite direction.  If the plaintiff had exercised due care in either instance, the accident would not have occurred.

Applying the doctrine of pure comparative negligence, I find that the defendant is thirty per cent at fault and the plaintiff is seventy per cent at fault.[5]

On the subject of damages, the plaintiff concedes that the

---

[5]  The plaintiff, who contends that she was not negligent at all, might regard this allocation of fault as unfair.  The defendant, on the other hand, might regard it as overly generous to the plaintiff in view of Brinson Ford, Inc. and similar cases. In my view, this allocation illustrates the equitable results that can be achieved under the pure comparative negligence rule, which permits a court to award some damages to an injured plaintiff even though her negligence substantially exceeds that of the defendant.

injuries she sustained in the accident have resolved except for the injury to her lumbar spine.  The plaintiff claims that this injury continues to cause debilitating pain for which she has received epidural injections without obtaining complete relief.  As a result of this injury, she walks with a cane, takes narcotic pain medication, and has given up gardening, cooking for her family, taking long walks, visiting friends and attending church.

I find that fair, just and reasonable compensation for the injuries the plaintiff sustained in this unfortunate accident is $300,000.  Based on the evidence, the plaintiff is entitled to recover special damages in the total amount of $35,636.34.

Conclusion

The Clerk will enter a judgment in favor of the plaintiff awarding her the total sum of $100,691.

So ordered this 18th day of March 2009.

                                             /s/ RNC
                                     Robert N. Chatigny
                               United States District Judge